Good morning. May it please the Court, I'm Kristen Olson. I represent the plaintiff appellant in this case, ATL Inc. We're asking you to reverse Judge Lasnik's summary judgment for the city and find that the city's dispersion ordinance for adult cabarets is unconstitutional. I'm going to try to reserve three minutes but we'll see how it goes. This dispersion ordinance cannot just be that was having an active adult cabaret business going on and then dispersion ordinances were enacted. You have to look at what happened before this dispersion ordinance was enacted and this is ASF v. City of Seattle where I got the city's 17-year moratorium on any new clubs overturned. That happened September 12, 2005. In that case, Judge Robart said at page 1107, for 17 years the city has blocked the issuance of a single adult cabaret license and effectively created a licensee scheme that fails to set limits on when the city must develop new land use regulations and resume issuing adult cabaret licenses. There is suggestion in the demand because no one applied in 2004 except for my client, but you couldn't apply in 2004. You couldn't even submit an application until September 12, 2005. At page 1104 of Judge Robart's opinion, he says it'll be sent back. We'll let you know when we've lifted the moratorium. Well, of course, the moratorium didn't get lifted. It had to be found unconstitutional. At page 1109, Judge Robart again says this, the city goes a step further in suppressing protected speech and prohibiting any new adult cabarets from opening. As a result, no new adult cabarets have opened in Seattle for 17 years. After Judge Robart's invalidation of the moratorium, the city passed ordinance 121952, which was a four-foot rule, effectively prohibiting what are known as lap dances, where the dancer comes closer and dances in front of you and gets tips. So that ordinance was enacted by the city. That's in the record at 1013 and 832. It was signed by the mayor right after the moratorium was overturned in October of 2005, but the current clubs in town did not like that. They got a referendum on the ballot and the city of Seattle voters rejected the four-foot rule in November of 2006. Can you help me understand how this discussion relates to your argument that the summary judgment in this case is erroneous? This has all to do with one of the factors that this court has said in Young v. City of Simi Valley, that you have to look at demand. And Judge Lasnik did not really take into account the chilling effect of no new clubs for 17 years. Now there are at least 75 sites now available, right? No, that's not correct, and I'll get to that. The map is flawed. Even if there are really are 75 sites, which there aren't, and I'll get to that, that would only be one club for every 8,000 people, which courts, I think it's University v. City Miami County of Dade, said was unconstitutional because it's such a big population it doesn't provide sufficient reasonable alternatives. You said Seattle, did you mean Seattle? It's got 50,000 total land acres and it's got a population of 600,000 people. It's a big city. Anyway, so the voters overturned the four-foot rule showing that, you know, there is support for this kind of entertainment in Seattle. The city went back to the drawing board and enacted these to certain commercial zones. At some point they decided to ban them totally in industrial zones, which is strange, and this is in the record at 931. The original recommendation of the Planning and Development Director's Report was to have them be in industrial zones. So can I get back to the district court's order for a minute? I know we're planning to discuss this, but I had a preliminary question about whether the court's determination that there were 75 sites, whether that was the court's own fact finding or whether there was a basis for saying as a matter of law that there were 75 sites since this was a summary judgment motion. No, I mean that was very strange. The court in the order says, you know, and this is why I provided you with the map that he was referring to, and I'm going to talk about this more, but the court said, you know, I looked at the map the city provided and I counted myself and I found 75 little yellow swatches, which were a club could open. So the court credited the argument that it wasn't all a thousand plus sites, which the city had put forward because even once you set a site, the map has its own boundaries. So the district court credited that argument. Did the district court credit any of your other arguments? Because on the summary judgment standard, obviously all the inferences go in the favor of the non-moving party. Well, see, and that's part of the problem here. See, I moved for summary judgment and the city filed a cross motion after I filed my motion. I was asking the court to rule as a matter of law that this very small area of this huge city was unconstitutional as a matter of law, and it was very surprising that the court denied that and then then granted summary judgment when I had pointed out that that this map and these yellow swatches was flawed because it included, the list included, a lot of areas that were not available, like cemeteries and golf driving ranges, and the court just said, well, you know, I looked at the map. I counted the 75 little yellow dots and I find that that's sufficient as a matter of law. Was there anything wrong with that ruling? What was wrong with that ruling? What was wrong with the ruling? With saying that there's at least 75 sites, because the city only has the burden of showing that there are reasonably available alternative sites. Well, because, let me find that in my in my notes, I pointed out by submitting the city's list, which the map was created from, and I marked on it all the places that were really not available, and so that... Were they not available because they were with other uses or not available because they didn't satisfy the conditions of the zoning ordinance? No, no, because they weren't they weren't available, and under this court's analysis in Topanga Press v. City of Los Angeles, they have to be actually economically available to the person. A cemetery certainly wouldn't be. The list, so this was it. Let's see. Let me find where that was in the record, but there was a there was a list, and I marked on the list all the places that weren't actually available, which if the court didn't find that it was unconstitutional as a matter of law, the court should not have found that it was constitutional as a matter of law, because of all those locations that weren't actually available. So what is your contention? Cemetery is not available. How many places do you think are available? Oh, much less than 75. Much less. And, shoot, I can't find that where that's in the record, but it was attached to... Oh, here it is. It's in the record at pages 678 to 697 is all the list of places from which the city created this map, and you'll see that there are cemeteries, mobile home parks, lots of other locations that show that the map is flawed. So there are less than 75 locations, and I want to get to the really important part of my argument. This ordinance is considerably more restrictive than the one the Supreme Court approved in City of Renton. Renton is a much smaller city. There were 520 acres available, 5% of the city's total land area. This is half a percent. The city said there were 300 acres. Even if we take that to be true, it's half a percent. Buffers between clubs is a really significant difference from Renton, because what happens is the area shrinks as clubs open. It's not just the low percentage. Does the case law indicate that there's any flaw as a matter of law, as opposed to on the case-specific rulings that we've seen in most of the cases? No, I don't think there is, and the Supreme Court has not revisited that. So if, say, there were 10 sites, there's no case law that supports that as a matter of law, 10 sites is too few, right? No, there isn't. But every case I found where it's under 1% was found unconstitutional. And the really important, other important factor is, on this map, when it was created, there's four little purple dots. You had four clubs in Seattle when the moratorium was overturned. You had Deja Vu, you had Ricks up here, you had Centerfold, you had Sands. Now the club that actually blocked my client from opening, the Dancing Bear, was not on this map. Another indication that this map is had an old permit, an old expired permit. So are you saying that at a minimum there was a genuine issue of material fact as to how many sites were reasonably available? At a minimum, but I think you can rule as a matter of law for various reasons that this ordinance is unconstitutional. An ordinance is supposed to be looked at the time of challenge, not the time of enactment. This is T.J.'s of New York v. Town of Smithton, where the court said at page 23, the alternatives available when a statute is passed can disappear, thus decreasing the availability of alternative sites available to would-be speakers. And as this court correctly pointed out in Topanga Press v. City of each other, this is their export. He concluded that acreage available to the 10th or 20th business to relocate would be dramatically less than the percentage of area definitionally available to the first adult business. So what happens now in this map, and of course pink is where you can't open. This is why I wanted you to see it. It's practically the whole city. Half a percent of the total land area is available, and I believe under City of Renton that that is unconstitutional. What's happened? I was seeing if you wanted to save the rest of your time. I'm going to just say one more thing. As the city acknowledges in its brief at page 7, three new clubs have opened since the ordinance was, the dispersion ordinance was passed and the moratorium was overturned. Little Darlings, which is up by the new federal courthouse, Dream Girls, which is down by Coffield, the city said that's okay even though thousands of kids walk by there because it's a private open space, and Pandora's. So what happens, as the court pointed out in Topanga Press, is as new clubs open, the area shrinks. These clubs have locked up downtown, and a big city like Seattle, and you can only have three adult cabarets, it's unconstitutional as a Good morning, my name is Carlton, so I'm representing the city of Seattle. May it please the court, the record in this case shows that since Seattle's ordinance was passed in 2007, four applications were made for new adult cabarets, and three out of the four were granted. The only one that wasn't granted was the appellants in this case, because it had not met the dispersion standards. Since the briefing has been completed, your honor, another application for an adult cabaret has been granted on 4th Avenue at a club soon to be called, or anticipated to be called, Kittens. This is a case of an applicant who didn't want to follow the rules, despite being told repeatedly by the city what was required. Everyone else who followed the rules and applied for an adult cabaret permit in this case has been granted a permit. There's ample opportunity, both substantively and procedurally, for new adult cabarets in Seattle. The standard is whether the number of proposed sites is sufficient to meet existing demand for sexual or pornographic speech, and I'm quoting from the Tolis case, which was a decision of this court. Could you help me, though, with the district court's ruling on the reasonably available sites? I was concerned about that, because they had the list and the map, and the city did not agree with, the court did not agree with everything the city said. They said, well, I know there's this buffer zone that occurs when a new site is cited, so not all of the sites are available. And then it said, well, I've looked at it myself, and I've, and based on things I know about the neighborhood, I've determined there's 75 sites. So that sounded to me like district court fact-finding, which of course you can't do on summary judgment. So how do we get around that? Your Honor, what's crucial in this case, or the standard is, that it's the burden of the appellant to show that there are insufficient numbers of sites. But doesn't the city have to come forward and show that there are some reasonably available alternative sites? The city's burden is to come forth with a reasonable list, which it did with the thousand sites that were available. Then the burden became on the appellant to show that those thousand sites were no longer available. Now when the list that appellant mentions of the thousand sites, she went through and lined out the sites that she thought, without presenting any real evidence about it, that were not available, there were only 315 sites that she identified. So the court's finding of 75 available sites is more or less a ruling that the appellant hadn't met its burden of showing that the reasonable list that the city had presented, you know, was insufficient. Well, how do we know that 75 is right? I mean, maybe it's zero, maybe it's one. If there's no, if the district court disheld or determined that that list sites were not actually available to meet the legal standard. The 75 site finding by the court, Your Honor, is logical because if you look at the map, each of those yellow swatches is not just a single parcel. Each of those yellow parcels is a large area of the city containing many parcels. So if there were even just one parcel in each of those yellow swatches, there at a minimum there should be 75 sites. So it's just a logical conclusion. These sites include, this map, does it show actual permitted operating places or only places that have a permit that weren't in fact operating yet? This map showed the four permitted sites that were actually operating and at the time. It didn't show Dancing Bear. So presumably there's other sites in there where they have an old permit but aren't operating. I don't know how you could infer that there are none since Dancing Bear wasn't listed. Well, I wouldn't presume that, Your Honor. It just so happened that Dancing Bear was not operating and the, you know, as we stated in our brief, searching the city's land use records, which goes back more than 100 years for use permits, is a daunting task. But so if an applicant comes in and goes to one of the 75 places the district court thought was available and then the city undertakes this permit review, it could well not be available because they'll find somewhere a permit that was issued that isn't expired, correct? That is correct, Your Honor. So that's why I'm sort of in a quandary. It's how could the district court make this determination on summary judgment? It seemed like there wasn't enough information there and the district court just ventured into its own fact-finding. Well, as I said again, Your Honor, the burden of the city is to present a reasonable list and I will quote from this court's decision in Lim versus City of Long Beach. In that case, the court stated, we are aware of no federal case that requires municipalities to identify the exact locations to which adult businesses may relocate as opposed to identifying the general areas that remain available and proving that such areas contain enough potential relocation sites that are physically and legally available to accommodate the adult establishments. So the city has met its burden. Well, but you know, some of the sites of that thousand were ones in residential areas that the appellant pointed out, right? And you can't have an adult cabaret in a residential area. Your Honor, the sites in residential areas, the zoning of the city has residential zoning, but there are also mixed zonings, mixed residential and business zones, areas where, you know, the dispersion standard does not prohibit clubs from locating next to residential or residences. It's certain uses. So clubs could be located next to residences and in a mixed zone, that's possible. So the annotation on the list said res or residential. And so are you saying that in a residential area that's marked residential, that the adult cabaret would satisfy the conditions of that zoning ordinance normally in Seattle? It may be. It really depends on the exact zone and whether or not there are any competing uses within the buffer area. Of course, once a club opens like Dancing Bear, that creates a 600 foot circle right there, doesn't it? It would exclude another cabaret. That's correct. So as more cabarets open, the area available to a new cabaret shrinks. That's correct. But again, Your Honor, the standard is whether the number of sufficient of sites is sufficient to meet existing demand. Now, the city council predicted that the demand would have been sufficient numbers of sites to accommodate all of the, let's say, the floodgates of new applications that have been submitted since the ordinance was passed. And the city council and the trial court found that there were more. If there were 75, logically, then that would leave at least 70. And it's the burden of the appellant to show that there aren't, and they have not met that burden. How do we know what the demand is? I mean, is 10 adult cabarets enough for Seattle or is 100 appropriate? Your Honor, since 2007, which was seven years ago, there have been only five applications. And so the prediction of the city council has played out. I want to compare that to the argument that the appellant made about the city of Portman, which apparently has about 50 adult cabarets. But they did not point out the difference is that in Portland, they're allowed to sell alcohol at adult cabarets, whereas in Seattle, they're not. And that makes a marked difference between the demand in Portland and Seattle. So far... The liquor is more attractive than sex, apparently, right? I don't have an answer to that, Your Honor. I'd like to also move to the issue of whether the city's 120-day time limit for granting an application is sufficient under the First Amendment. Now, the 120-day requirement is a state law. It's a law of general application, and it applies to all processes and phases in the development of any development project. It's reasonable for every type of development project in the state. And it should, you know, there is nothing in the First Amendment that gives adult entertainment priority in obtaining development permits, as Justice Scalia said in his concurring opinion in the The notion that media corporations have constitutional entitlement to accelerated judicial review of the denial of zoning variances is absurd. And the same applies to a development or a permit, a use permit. There's no reason why an adult entertainment use should get priority in getting a building permit. What about the dispersion analysis? Is that directed only at the adult enterprises or at others as well? The it's only directed at adult entertainment, Your Honor. There are other dispersion standards, but they're not at issue in this case. Well, it was your basic position on the 120-day. Do you also say that ATL is collaterally a stopped? Yes, well, the trial, the trial court found that ATL was collaterally stopped because the Washington, both the Superior Court and the Court of Human Parties, as this case, in that case, the city brought a case against Robert Davis and ASF, Inc. Now, Robert Davis is the sole shareholder and sole officer of ASF, Inc. But he's also the sole shareholder and sole officer of the corporation, in this case, ATL. And so there was exact privity in that case. And the same issue was presented in that case where the Washington states and the city's 120-day development deadline is sufficient under the Constitution. And both the trial court, the state trial court and the Washington Court of Appeals held that it was. By the way, that Washington Court of Appeals decision has recently been published. But even so, the trial court, in this case, found alternatively that the 120-day time period was reasonable in footnote four of its order, granting the city's second motion for summary judgment. We wouldn't have to reach that issue, though, if we agreed that it was collateral estoppel. That's correct. So if a business does not need to do any building and it's already a comedy club or something and then just wants to change use to adult cabaret, does the 120-day period still apply to make that change of use? Yes, it does, Your Honor. In the Erickson case, the Washington Supreme Court approved of the state's vesting rule. And under that vesting rule, an applicant's legal rights vest when they submit a completed building permit application. Now, the Washington Supreme Court approved of that because it struck a proper balance. On one hand, it affords the applicant control over the time of vesting. On the other hand, it indicates the requisite level of commitment that the applicant should show to avoid permit speculation where an applicant will obtain a use permit of some kind and never do anything with it. But it's not a legal fiction for an applicant to submit a building permit application, even though they don't anticipate any construction, because a building permit application is required to establish occupancy of a use, even though no construction is required. So, for example, if we took a nightclub and an applicant was not going to do any construction, the occupancy levels would be different for a nightclub than it would be for a strip club, because the strip club rules have certain regulatory requirements, such as distance between have to be open sight lines so that there are no concealed spaces where illegal activity can occur. And so, yes, even though construction is not contemplating, a building permit would be legally valid. And therefore, the applicant has control over vesting. Your Honor, I would just like to conclude by stating that the ordinance provides ample opportunity for new strip clubs. Since the ordinance was passed, every application for a new adult cabaret has been granted except for appellants, and we would request that the decision below be affirmed. Thank you. I think I have a minute left. The Court correctly states the standard to be applied in this case, and citing Young v. Simi Valley, current demand, chilling effect, percentage available, characteristics of Seattle's population, and comparable communities. But the Court did not apply that. The percentage is so low, the Court did not look at the fact that Portland has more strip clubs. And it's actually untrue. If you look at WAC 314-11050, alcohol is not prohibited in strip clubs. It's just that if you have alcohol, the entertainer has to be on a stage 18 inches high and 6 feet away. It's not prohibited. As far as the, I made three arguments. The other one was it's not narrowly tailored, and that's because he was prohibited from opening from within 800 feet of a daycare that had never opened in an adult club that was not in existence. It hadn't been for years. 120 days is unconstitutional under Tullis v. County of San Diego. There's no case that says a sister corporation. That's just a fiction the Council for the City states that these two corporations have the same president and shareholders. There's nothing in this record to indicate who the shareholders of these corporations are. The only similarity is that they have the same president. That's it. And the same lawyer. I don't think that has anything to do with it. But the Court should rule as a matter of law that this ordinance is unconstitutional because it's so restrictive. And as new, as you could see from the map, that with the new clubs that are now open, the area is even smaller. So someone trying to open, when my client was trying to open, would not have an opportunity. Thank you. We thank both of you for your argument. And the case of ATL Corporation v. City of Seattle is submitted.
judges: Alarcon, Gilman, Ikuta